Filed 10/16/24  P. v. Bomar CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(El Dorado)

----

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>  v.<br><br>CODY LEWIS BOMAR,<br><br>    Defendant and Appellant. | C099412<br><br>(Super. Ct. No. P18CRF01131) |

Defendant Cody Lewis Bomar and his brother, Chase Bomar, stabbed a man to death.[1]  Cody now appeals his resulting conviction for second degree murder.  He raises seven arguments:  (1) the trial court should not have instructed the jury on aiding and abetting a murder with express malice, (2) the court incorrectly instructed the jury on aiding and abetting a murder with implied malice, (3) the court's instructions improperly

---

[1] Because they share the same last name, we refer to Cody and his brother, Chase, by their first names for clarity.  No disrespect is intended.

1

allowed the jury to find him guilty of murder based on the natural and probable consequences doctrine, (4) the court wrongly failed to instruct on self-defense, (5) the court wrongly failed to instruct on defense of property, (6) the court included inapplicable language in one jury instruction, and (7) the court wrongly excluded evidence about one witness's prior misconduct. Finding no reversible error, we affirm.

## BACKGROUND

The charges in this case stem from the killing of Jeremy Fortuin. Fortuin formerly lived in a house with, among others, Cody, Cody's girlfriend (Haley Redmond), and Redmond's parents: Johnny Ring and Tanya Jones. Everyone moved out after the house was "red-tagged," that is, after local authorities deemed the house unfit to inhabit.

Sometime after, Fortuin returned to the house and assaulted Cody and Chase. The brothers spoke to officers following the assault. In their telling, they went to the red-tagged house to remove their property. While the brothers were still in their car, at least five men, including Fortuin, came over carrying pipes or bats. The brothers heard some noises shortly after, leading them to believe that Fortuin and the others had broken into the house. When the brothers confronted Fortuin, he accused them of stealing his generator and swung a pipe. He ultimately struck both brothers in the forearm, hitting Chase hard enough to leave a dent.

Around the same day, Fortuin attempted to strike Jones too, according to Ring and Jones. Ring and Jones went to a house where Fortuin stored his possessions, believing they might find Ring's son's stolen bike there. Not finding the bike, Jones decided to take Fortuin's TV. But before she could leave with it, Fortuin appeared. In Ring's and Jones's telling, he grabbed her from behind and then swung his arms at her like a windmill. But before Fortuin struck anyone, Jones hit him three times with a golf club and Ring hit him with a pipe.

2

About five weeks after these events, Cody, Chase, Ring, Jones, and Redmond returned to the red-tagged house to remove Ring's and Jones's property. Fortuin was at a nearby house at the time visiting a woman he dated, Sabrina Roesner. After a friend called Fortuin saying he needed a car battery, Fortuin told Roesner he had a car with a battery at the red-tagged house. So they walked together to the red-tagged house to collect the battery for the friend.

On reaching the red-tagged house, Fortuin started walking up the house's driveway. Both Ring and Jones saw Fortuin approach and believed he carried a stick. Jones said she saw Fortuin holding a stick up his sleeve, and Ring said he saw Fortuin holding a 26-inch stick that he put up his sleeve. Roesner, on the other hand, said he carried no stick or other weapon. Stick or no stick, all three witnesses at least agreed that they never saw Fortuin pull out any stick from his sleeve or anywhere else. All witnesses also agreed that he never reached the house. Shortly after reaching the driveway, he turned around and started walking away, saying, "I don't want any problems."

Cody and Chase, both armed with knives, then gave chase. Roesner, Ring, and a driver passing through described what followed. According to Roesner, both brothers carried knives. One of the brothers stabbed Fortuin in his side in the street while Fortuin backpedaled away. Fortuin then stumbled across the road to a truck, covering his head with his arms. The brothers followed and both repeatedly stabbed him.

Ring also saw both brothers carrying weapons, with Cody carrying a knife and Chase carrying something long and pointy, though he generally said the events were a blur. Cody swung at (but missed) Fortuin's chin while Fortuin walked toward him in a manner suggesting he would "plow right over" him. But after accusing the brothers of trying to stab him, Fortuin fled about 100 yards away to the other side of the street. Chase caught up to Fortuin near a truck and stabbed him in the side. Cody caught up afterward. At some point, Fortuin swung trying to protect himself. In Ring's count,

Chase stabbed Fortuin two or three times and Cody swung at Fortuin about four times with a knife—though he did not know whether Cody ever connected.

A driver passing through with his son also saw Cody and Chase attack Fortuin, though he saw no weapons. Both brothers swung punches at Fortuin. Fortuin backpedaled and repeatedly said, "No. Don't. Stop." But the brothers continued to attack him. Fortuin tried to defend himself, "thrust kicked" one of the brothers, and tried to get away. The driver, becoming concerned for his son's safety, drove away as the fight continued.

Officers arrived shortly after, finding Fortuin dead with multiple stab wounds. They never found the stick that Fortuin allegedly held. But they later found two knives associated with the attack on Fortuin: Cody's Swiss Army knife with three blades, each measuring (or just shy of) two and one-half inches long, and Chase's knife with a blade measuring four to five inches long. A criminalist examined both knives for DNA. For Chase's knife, he found Fortuin's blood on the knife's blade and DNA from multiple people on the knife's handle. He found it far more likely than not that Chase contributed some of this DNA. For Cody's knife, he found DNA for two different people, with very strong support for inclusion of Cody, moderate support for inclusion of Fortuin, and very strong support for exclusion of Chase. Expanding on the phrase "moderate support," he said it is 450 times more likely that Fortuin contributed DNA than that he did not contribute DNA.

A forensic pathologist examined Fortuin and found he suffered 12 stab wounds. After considering Cody's knife and Chase's knife, she found three stab wounds were more consistent with Cody's knife, including one that entered the chest, one in the back

of the left shoulder, and another in an arm.[2]  She also found four stab wounds were more consistent with Chase's knife, including three that entered through the left arm and one that entered through the upper back and penetrated the left lung and heart.  She further said that the remaining stab wounds could have been caused by either knife, including one that touched the heart's surface and two others that penetrated three inches into the chest and stomach.  She acknowledged that some of these wounds went deeper than the length of Cody's knife.  But she explained that a wound's depth can exceed a blade's length when the knife is thrust into the body.  She believed that Fortuin died of multiple stab wounds and that each wound could have contributed to his death.

A day after Fortuin's death, officers found Cody and Chase in Nevada.  Cody initially told officers he was in Nevada at the time of Fortuin's death.  But he ultimately admitted he was at the red-tagged house, described his history with Fortuin, and discussed the stabbing.  He said that about a month before, Fortuin and several others beat up him and Chase, bashed the windows on his two cars, and stole his tires.  He then talked about the day of Fortuin's death.  He said he saw Fortuin walking away from the red-tagged house, with one of his arms appearing stiff as if he had something up his sleeve.  He ran after Fortuin, punched him, and then tried to stab him with the Swiss Army knife, but the knife closed on Cody's thumb.  Fortuin yelled for him to stop, said that "[y]ou're killing me," backed away, and tried to punch back or kick him away.  But Cody continued hitting Fortuin, stopping only after he saw Fortuin's knife wounds and "knew he was done."  Explaining his actions, Cody said "something specifically about wanting to get back at [Fortuin] for what he did to him the month prior" and about not "let[ting] that happen again."  He added that Fortuin never pulled out any weapon and

---

[2]  For the wound to the back of the left shoulder, she initially said she could not reach an opinion as to which knife caused it.  But she later said this wound was more consistent with Cody's knife.

that although he tried to stab Fortuin, he was unsure whether he ever connected. He told Redmond, though, that both he and Chase stabbed Fortuin.

Cody and Chase afterward talked about Fortuin's death at a sheriff's office in Nevada. They talked in a room that had an audio and video recorder. Cody told Chase, "[T]hey've figured us out." Chase said, "You didn't do anything." But Cody replied, "I did. I mean, I had the knife too" and "whether I got [him] or not, I mean, I tried to." He also said, "I told them he got stabbed and why we did it," adding that "it's a way of self-defense, just a month late."

Cody and Chase were both later charged with first degree premeditated murder (Pen. Code, §§ 187, subd. (a), 189, subd. (a)) committed with a deadly weapon (*id.*, § 12022, subd. (b)(1)). The jury found neither Cody nor Chase guilty of first degree murder. But it found both guilty of second degree murder and, for each brother, found true the allegation that he used a deadly weapon. The trial court sentenced both Cody and Chase to 15 years to life for the murder plus a consecutive year for the use of a deadly weapon. Cody filed a timely notice of appeal in September 2023. His opening brief was filed in March 2024, and this case became fully briefed on July 16, 2024.

DISCUSSION

I

*Aiding and Abetting with Express Malice*

On appeal, Cody principally challenges the trial court's jury instructions. He first asserts that under the court's instructions, the jury could have found him guilty of second degree murder based on a theory—aiding and abetting a murder with express malice—that lacked evidentiary support. He notes that to find him guilty under this theory, the jury needed to find that he intended to kill. But he contends insufficient evidence supports a finding that he had this intent. We disagree.

We start with some background legal principles. Outside of felony murder, all principals in a murder—including any aider and abettor—must act with malice

6

aforethought to be convicted of murder. (Pen. Code, §§ 31, 188, subd. (a)(3), 189, subd. (e).) An aider and abettor can be shown to have the requisite malice aforethought either under a theory of express malice or implied malice. To be liable under a theory of express malice, courts have said that an aider and abettor must aid in the commission of the murder " 'with "knowledge of the direct perpetrator's unlawful intent and [with] an intent to assist in achieving those unlawful ends." ' " (*People v. Curiel* (2023) 15 Cal.5th 433, 463.) To be liable under a theory of implied malice, on the other hand, "an aider and abettor must aid in the commission of a life-endangering act, with ' "knowledge that the perpetrator intended to commit the act, intent to aid the perpetrator in the commission of the act, knowledge that the act is dangerous to human life, and acting in conscious disregard for human life." ' " (*Ibid.*) The former theory (involving express malice) requires an intent to kill, but the latter (involving implied malice) does not. (See Pen. Code, § 188, subd. (a) [defining express and implied malice].)

In this case, we accept Cody's characterization of the jury instructions: They allowed the jury to find him guilty on the theory that he aided and abetted the murder with express malice—that is, with the intent to kill. But we reject his claim that the evidence was insufficient to show that he had an intent to kill. Or to put it another way, we conclude that the record contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—that would allow a rational juror to find that he had the intent to kill. (*People v. Navarro* (2021) 12 Cal.5th 285, 302.)

Per the evidence, Cody and Chase together chased Fortuin and repeatedly stabbed him in his upper body. Cody admitted that he at least "tried to" stab him. And a forensic pathologist testified that of Fortuin's 12 stab wounds, three were more consistent with Cody's knife, including one that entered the chest cavity and could have led to lung collapse. She also said that these wounds could have contributed to Fortuin's death and that Cody's knife could have inflicted several more of Fortuin's wounds too. Setting aside whether Cody's actions in fact contributed to Fortuin's death, it is significant that

Cody *repeatedly* attempted to stab Fortuin. Such intentional and repeated actions in and of themselves constitute substantial evidence of an intent to kill and considering this record, we conclude that a rational juror could find that Cody had the intent to kill. (See *People v. Avila* (2009) 46 Cal.4th 680, 701-702 [evidence that defendant "repeatedly attempted to stab [the victim], an unarmed and trapped victim, and succeeded in stabbing him in the arm and leg" was "alone . . . substantial evidence of defendant's intent to kill"].)

Pushing for a contrary conclusion, Cody argues that his knife—which he vaguely characterizes as "short"—"was not reasonably likely to penetrate the victim's multiple layers of clothing, especially to penetrate deeply enough to inflict a fatal injury." But while true that Fortuin wore multiple layers of clothing, the forensic pathologist's testimony supported the finding that Cody's knife still caused several of Fortuin's wounds. Again, she found three wounds—including one to Fortuin's chest that could have led to lung collapse—were more consistent with Cody's knife. That could suggest that Cody's knife did in fact penetrate Fortuin's multiple layers of clothing, including his T-shirt, flannel shirt, and jacket. Or it could suggest that Cody's knife struck more exposed areas—perhaps striking an area covered only by the T-shirt. Either way, we reject Cody's claim that his knife was too short to allow a finding of intent to kill.

II

*Aiding and Abetting with Implied Malice*

Raising a related challenge, Cody asserts that the trial court improperly instructed the jury on aiding and abetting a murder with implied malice. He raises three arguments on this topic, none of which we find persuasive.

First, Cody argues that the trial court should not have instructed the jury on aiding and abetting a murder with implied malice because Chase acted with express rather than implied malice. His argument comes in two parts. Citing no law, he first asserts that "to be convicted of implied malice murder as an aider and abettor to Chase, it must be shown

8

that Chase committed implied malice murder and that Cody aided and abetted that murder." Then, citing no facts, he suggests that as a matter of law, the jury here could not have found that Chase acted with implied malice; it could only find that he acted with express malice. Neither point is accurate.

Starting with the law, Cody wrongly believes that for an aider and abettor to be liable under a theory of implied malice, both the perpetrator and the aider and abettor must have acted with implied malice. No case, as far as we have found, says that the perpetrator and the aider and abettor of a murder must demonstrate malice aforethought in the same way, whether expressly or impliedly. Governing case law instead explains that "an aider and abettor's mental state must be at least that required of the direct perpetrator" (*People v. McCoy* (2001) 25 Cal.4th 1111, 1118)—which in this case, is malice aforethought. So even if the jury believed that Chase acted with express malice, that would not preclude it from finding Cody guilty on the theory that he aided and abetted the murder with implied malice. (*Ibid.*)

Turning to the facts, Cody wrongly suggests that as a matter of law, the jury had to find that Chase acted with express malice rather than implied malice. The jury, to be sure, could have found that Chase had an unlawful intent to kill and so acted with express malice. The evidence, after all, allowed the jury to find that Chase chased Fortuin and then stabbed him at least four times with a large knife. Those types of facts can, as covered already, support a finding of express malice. (See *People v. Avila, supra*, 46 Cal.4th at pp. 701-702.) But they can also support a finding of implied malice. They can support, that is, a finding that Chase committed " 'an act, the natural consequences of which are dangerous to life,' " and " 'kn[ew] that his conduct endanger[ed] the life of another and . . . act[ed] with conscious disregard for life.' " (*People v. Soto* (2018) 4 Cal.5th 968, 974; *People v. Torres* (1963) 214 Cal.App.2d 734, 739 [defendant's stabbing a victim several times "justifie[d] an inference of implied malice"].)

9

Second, Cody argues that the trial court should not have instructed the jury on aiding and abetting a murder with implied malice because "there was no evidence that the defendants conspired or jointly intended to commit a life-endangering act." But we fail to understand his point about the lack of evidence of a conspiracy. No one is alleging that he and Chase conspired to kill or harm anyone. Nor is that required for an aiding and abetting conviction. We also reject his claim about the lack of evidence showing that he and Chase intended to commit a life-endangering act. Again, the evidence supports a finding that the brothers together charged Fortuin and then repeatedly stabbed him. On this record, the jury could have found that both brothers knew their conduct endangered Fortuin's life. (*People v. Landry* (2016) 2 Cal.5th 52, 97 ["an assault with a knife may reflect implied malice"].)

Third, Cody argues that the trial court's jury instruction "improperly refers to the perpetrator's commission of 'the crime,' not, as it should, to 'the life-endangering act.' " Understanding his argument requires a little context. The jury instructions here told the jury that Cody would be guilty of aiding and abetting if: (1) "The perpetrator committed the crime," (2) "[t]he defendant, Cody Bomar, knew that the perpetrator intended to commit the crime," (3) "[b]efore or during the commission of the crime, the defendant, Cody Bomar, intended to aid and abet the perpetrator in committing the crime," and (4) "[t]he defendant's . . . words or conduct did in fact aid and abet the perpetrator's commission of the crime."

Our court has previously found that an instruction along these lines is "not tailored for th[e] theory" of aiding and abetting a murder with implied malice. (*People v. Powell* (2021) 63 Cal.App.5th 689, 714.) We reasoned that "the aider and abettor of implied malice murder need not intend the commission of *the crime* of murder. Rather, relative to the aider and abettor's intent, he or she need only intend the commission of the perpetrator's *act*, the natural and probable consequences of which are dangerous to human life, intentionally aid in the commission of that *act* and do so with conscious

10

disregard for human life." (*Ibid.*) All this suggests, as Cody argues, that when a trial court seeks to instruct the jury on aiding and abetting a murder with implied malice, it should refer to "the life-endangering act" rather than "the crime."

We are not certain, however, that the trial court here even instructed the jury on aiding and abetting with implied malice. Under the instructions, again, the jury had to find, among other things, that Cody aided Chase (1) knowing Chase "intended to commit the crime" (i.e., the murder) and (2) intending to aid Chase "in committing the crime" (i.e., the murder). Or to put it another way with context, the jury had to find, among other things, that Cody aided Chase (1) knowing Chase intended to kill Fortuin and (2) intending to aid Chase in killing Fortuin. This suggests (if not outright shows) that the jury had to find that Cody acted with an intent to kill—that is, express malice—and not merely implied malice. After all, if an aider and abettor " 'give[s] aid or encouragement with knowledge of the direct perpetrator's intent to kill and with the purpose of facilitating the direct perpetrator's accomplishment of the intended killing,' " that means the aider and abettor " 'must intend to kill.' " (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1054 [discussing aiding and abetting an attempted murder].)

But even assuming the trial court instructed the jury on aiding and abetting with implied malice, we are not persuaded that the reference to "the crime" rather than "the life-endangering act" was prejudicial. Our court has previously reviewed this type of alleged error under *Chapman v. California* (1967) 386 U.S. 18—which requires reversal unless the error was harmless beyond a reasonable doubt. (*People v. Powell, supra*, 63 Cal.App.5th at p. 714.) Applying this standard here, we find the alleged instructional defect harmless, for at most, this alleged defect only made it harder for the jury to find Cody guilty.

Comparing Cody's preferred instruction to the given instruction demonstrates as much. Under Cody's preferred instruction, the jury should have been required to find that he knew Chase intended to commit a life-endangering act—not that he knew Chase

11

intended to commit murder. And under Cody's preferred instruction, the jury should have been required to find that he intentionally aided Chase in committing the life-endangering act with conscious disregard for human life—not that he intentionally aided Chase in committing the murder. But compared to Cody's desired instructions, the instructions given only made it "more difficult for the prosecution to establish [Cody's] culpability for murder." (*People v. Butler* (2009) 46 Cal.4th 847, 871.) It would have been far easier, for instance, for the jury to find that Cody knew Chase intended to commit a life-endangering act, than to find that Cody knew Chase intended to commit a life-ending act, that is, a murder. Under these circumstances, we find the alleged instructional defect harmless beyond a reasonable doubt.

III

*Natural and Probable Consequences Doctrine*

Cody next claims the jury instructions allowed the jury to find him guilty based on a defunct legal theory—the natural and probable consequences doctrine. We disagree.

Courts have historically said "that an aider and abettor's liability for criminal conduct is of two kinds. First, an aider and abettor with the necessary mental state is guilty of the intended crime. Second, under the natural and probable consequences doctrine, an aider and abettor is guilty not only of the intended crime, but also 'for any other offense that was a "natural and probable consequence" of the crime aided and abetted.' " (*People v. McCoy, supra*, 25 Cal.4th at p. 1118.) Our discussion so far has made no mention of this latter theory. And there is a simple reason for that: It has not been a valid theory for years. With Senate Bill No. 1437 (2017-2018 Reg. Sess.) (Senate Bill 1437), the Legislature eliminated this theory starting in 2019. (Stats. 2018, ch. 1015, § 2; *People v. Reyes* (2023) 14 Cal.5th 981, 990.) So no longer can a defendant be convicted for an unintended offense under the natural and probable consequences doctrine.

12

Claiming the trial court here defied this change in the law, Cody asserts that the trial court wrongly instructed the jury using CALCRIM No. 520—which Cody labels as the instruction on the natural and probable consequences doctrine. He is wrong. CALCRIM Nos. 402 and 403 are the standard jury instructions on the natural and probable consequences doctrine. CALCRIM No. 520, on the other hand, is the instruction on murder with malice aforethought. It uses the words "natural and probable consequences." But in doing so, it is not describing the natural and probable consequences doctrine—which allowed fact finders to *impute* malice to a defendant. It is instead explaining *implied* malice. It explains that malice is implied when a defendant intentionally commits an act, the "natural and probable consequences" of this act were dangerous to human life, the defendant knew this act was dangerous to human life when committing the act, and the defendant deliberately acted with conscious disregard for that danger. That definition of implied malice—which is distinct from the natural and probable consequences doctrine—remains valid today. (See *People v. Reyes, supra*, 14 Cal.5th at p. 988.) Nothing in Senate Bill 1437 touched this definition, as courts have already explained. (*People v. Soto* (2020) 51 Cal.App.5th 1043, 1057 ["Senate Bill No. 1437 changed the circumstances under which a person could be convicted of murder without a showing of malice, but it did not exclude from liability persons convicted of murder for acting with implied malice"].)

IV

*Defenses*

Next, Cody contends the trial court violated its sua sponte duty to instruct on two defenses. " 'In criminal cases, even in the absence of a request, a trial court must instruct on general principles of law relevant to the issues raised by the evidence and necessary for the jury's understanding of the case.' " (*People v. Anderson* (2011) 51 Cal.4th 989, 996.) "That duty extends to ' "instructions on the defendant's theory of the case, including instructions 'as to defenses " 'that the defendant is relying on . . . , or if there is

13

substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case.' " ' " ' " (*Ibid.*) Here, Cody's argument concerns two potential defenses: self-defense and defense of property. He makes no claim that he raised either defense at the trial level. He argues instead that substantial evidence supported these defenses, triggering the need for instruction.

A. *Self-Defense*

Starting with self-defense, Cody asserts that substantial evidence supported instructing the jury on self-defense using CALCRIM No. 505. He adds that the prosecution should have had the burden to show the absence of self-defense. (See Pen. Code, § 189.5, subd. (a) [a defendant charged with murder generally has the burden of establishing self-defense, but not when "the proof on the part of the prosecution tends to show" the defendant acted in self-defense].) We disagree, finding insufficient evidence in the record to support this instruction.

CALCRIM No. 505 describes justifiable homicide in self-defense or defense of another, and it derives largely from Penal Code section 197. It applies when a defendant reasonably believes that killing is necessary to avert an imminent threat of death or great bodily injury. (See *People v. Humphrey* (1996) 13 Cal.4th 1073, 1082 [discussing the elements for killing in self-defense].) Arguing the evidence supported instruction under CALCRIM No. 505, Cody states that Fortuin was a good fighter, around six feet two inches tall, and about five weeks before the stabbing, he swung his arms like a windmill at Jones when she tried to take his television, forced entry into the red-tagged house, and hit both brothers on the arm with a bat or a pipe while accusing them of stealing a generator. Cody adds that according to some witnesses, Fortuin held (or might have held) a stick up his sleeve at the time of the stabbing. Cody told an officer, for instance, that Fortuin's arm appeared stiff as if he had something up his sleeve—though Cody added that Fortuin never pulled out any stick or weapon.

14

But Cody's cited evidence, standing alone, is not substantial evidence showing he reasonably believed killing Fortuin was necessary to avert an imminent threat of death or great bodily injury. Cody might have had a bad history with Fortuin, including having suffered a prior assault with a weapon. But that did not give him the right to charge and kill Fortuin simply because Fortuin appeared to have something, perhaps a stick, up his sleeve. (See *People v. Humphrey, supra*, 13 Cal.4th at p. 1082 [to kill in self-defense, a defendant must actually and reasonably fear " '*imminent* danger to life or great bodily injury' "].)

Cody also ignores evidence about the context of the stabbing. According to the record, Fortuin (together with Roesner) walked toward the red-tagged house shortly before the stabbing. Cody, Chase, Ring, Jones, and Redmond were at the house at the time. Two testifying witnesses—Ring and Roesner—saw the moments before Cody and Chase attacked Fortuin. And both testified that the brothers attacked Fortuin only after Fortuin turned around and began walking away. Roesner testified that before the attack, Fortuin turned around and began walking away, saying, "I don't want any problems." Ring, similarly, testified that when the brothers "t[ook] off after [Fortuin], Mr. Fortuin was walking away from the property." Even Cody described the events similarly, telling an officer that he saw Fortuin walking away, ran after him, and then attacked him. On this record, no rational juror could find that Cody justifiably killed Fortuin in self-defense. (See *People v. De Leon* (1992) 10 Cal.App.4th 815, 825 [no substantial evidence showed the defendant honestly believed he was in imminent peril when he had "fir[ed] at men who had turned and started to walk away"].)

Nor can we find differently simply because Fortuin attempted to defend himself after Cody and Chase initiated the attack. A few witnesses testified on this topic. One witness—who was driving by at the time—testified that Fortuin "thrust kicked" one of the brothers when trying to defend himself and repeatedly pleaded for the brothers to stop. Ring testified that when Cody initially swung at Fortuin, Fortuin walked toward

15

Cody in a manner suggesting he would "plow right over" Cody—but Fortuin then tried to get away after accusing the brothers of trying to stab him. Ring added that at some point, Fortuin swung trying to protect himself. And an officer testified that according to Cody, Fortuin tried to punch back or kick him away in defense. But none of Fortuin's limited efforts to defend himself against the two armed brothers could be said to have given the brothers a right to kill. (See *In re Christian S.* (1994) 7 Cal.4th 768, 773, fn. 1 [self-defense "may not be invoked by a defendant who, through his own wrongful conduct (e.g., the initiation of a physical assault or the commission of a felony), has created circumstances under which his adversary's attack or pursuit is legally justified"].)[3]

B.      *Defense of Property*

Turning to defense of property, Cody contends substantial evidence supported instructing the jury on defense of property using CALCRIM No. 3476. We reject this argument too.

CALCRIM No. 3476 describes the right to defend property and, according to its accompanying Bench Notes, derives from Civil Code section 50. It explains that an owner of property "may use reasonable force to protect that property from imminent harm." This instruction is consistent with Civil Code section 50, which, relevant here, says: "Any necessary force may be used to protect from wrongful injury the . . . property of oneself." The instruction is also consistent with case law construing this statute, which explains that the threatened harm must be imminent. (*Calvillo-Silva v. Home Grocery* (1998) 19 Cal.4th 714, 730 ["The right to use force against another has long been limited by the condition that the force be no more than ' "that which reasonably appears necessary, in view of all the circumstances of the case, to prevent the impending

_____

[3] Cody relatedly argues that he received ineffective assistance because his trial counsel failed to seek instruction on self-defense. But we cannot fault Cody's trial counsel for failing to request instruction on a defense that lacked evidentiary support.

injury" ' "]; *People v. Minifie* (1996) 13 Cal.4th 1055, 1064 [a threatened wrongful injury "must be imminent" to trigger the right to defense].)[4]

Asserting an instruction under CALCRIM No. 3476 was warranted, Cody contends Fortuin approached the red-tagged house intending to steal a car battery. He notes that according to Roesner, Fortuin told her he needed a car battery for a friend, said he had a car with a battery at the red-tagged house, and they then walked there to collect the battery. He further notes that according to Ring, Fortuin had no property at the house at this time. Putting this testimony together, Cody concludes that Fortuin must have been planning to steal a car battery—presumably, Cody says, the battery from his Saturn that was parked at the house—and therefore he and Chase were justified in displaying their knives and trying to punch Fortuin.

Continuing his argument, Cody acknowledges that an attempted theft would not justify the use of deadly force. (See *People v. Ceballos* (1974) 12 Cal.3d 470, 483.) But he contends that once Fortuin tried to defend himself, the brothers were now justified in using deadly force. He reasons that Fortuin had superior size and strength and, even if unarmed, posed a threat of great bodily injury against the two knife-wielding brothers. He also cites the jury instruction on self-defense in mutual combat, CALCRIM No. 3471. That instruction explains, among other things, that if a defendant uses only non-deadly force against an opponent and the opponent responds suddenly with deadly force, then

---

[4] Several Penal Code statutes also touch on defense of property, though they are not mentioned in the Bench Notes accompanying CALCRIM No. 3476. (See Pen. Code, §§ 197, subd. 2 [homicide is justifiable "[w]hen committed in defense of habitation, property, or person, against one who manifestly intends or endeavors, by violence or surprise, to commit a felony, or against one who manifestly intends and endeavors, in a violent, riotous, or tumultuous manner, to enter the habitation of another for the purpose of offering violence to any person therein"], 693, subd. 2 ["Resistance sufficient to prevent the offense may be made by the party about to be injured: [¶] 2. To prevent an illegal attempt by force to take or injure property in his lawful possession"].)

the defendant can defend with deadly force without first attempting to withdraw. (See *People v. Crandell* (1988) 46 Cal.3d 833, 871-872.)

But Cody's cited evidence, in itself, is not substantial evidence showing that force was necessary to prevent the imminent theft of his car battery. To start, Cody has not identified any property of his own that he sought to protect. He mentions a Saturn parked at the house and says Fortuin presumably intended to steal the Saturn's battery. But according to the record, Ring, not Cody, owned the Saturn. And Civil Code section 50 would not necessarily allow Cody to use force to defend Ring's property. That is because the statute does not broadly grant a person authority to defend the property of all others. It instead grants only a limited right to protect the "property of oneself, or of a spouse, child, parent, or other relative, or member of one's family, or of a ward, servant, master, or guest." (Civ. Code, § 50.) And here, Cody makes no argument that Ring qualified as one of the persons described under this statute.

Still, we note that according to Ring, Cody had an inoperable car in the garage of the red-tagged house. So perhaps Cody meant to reference that car, not the Saturn. But even assuming Fortuin intended to steal this car's battery (to the extent it had one), and assuming further the brothers somehow knew of this intent, the brothers still would not have been justified in their conduct. Nothing in the record suggests that Fortuin was anywhere near this car. Nor does it suggest that force of any kind was necessary. It instead shows, again, that before the brothers attacked, Fortuin had turned around and was walking away from the house. Cody maintains that he and Chase still were justified in displaying knives and trying to punch Fortuin, describing this as necessary force to prevent the theft of the car battery. But no rational trier of fact could agree that this

conduct against a departing figure was necessary to prevent a theft, let alone necessary to prevent an imminent theft.[5]

## V

### *Cooling-off Instruction*

In the last of his challenges to the jury instructions, Cody contends the trial court wrongly instructed the jury with inapplicable language. His argument concerns the instruction on a killing in the heat of passion. An optional paragraph for this instruction (which the trial court included here) explains that a defendant does not kill in the heat of passion "[i]f enough time passed between the provocation and the killing for a person of average disposition to 'cool off' . . . ." Cody argues this paragraph should have been omitted because based on the evidence, the jury could not find that he had time to cool off. Assuming error, we find no prejudice.

We start with a little background on the law. Murder, again, generally requires a defendant to act with malice. But a defendant who kills in a heat of passion lacks the requisite malice for murder, reducing what would otherwise be murder to voluntary manslaughter. (Pen. Code, § 192, subd. (a); *People v. Beltran* (2013) 56 Cal.4th 935, 942.) "Heat of passion arises if, ' "at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment." ' " (*Beltran*, at p. 942.) But a defendant cannot claim to have acted in a heat of passion "[i]f sufficient time has elapsed for one's passions to 'cool off' and for judgment to be restored." (*Id.* at p. 951.)

---

[5] Cody relatedly argues that he received ineffective assistance because his trial counsel failed to seek instruction on defense of property. But again, we cannot fault Cody's trial counsel for failing to request instruction on a defense that lacked evidentiary support.

19

The trial court's instructions here tracked the law on heat of passion. The court explained that a defendant kills in the heat of passion if (1) "[t]he defendant was provoked," (2) "[a]s a result of the provocation, the defendant acted rashly and under the influence of intense emotion that obscured his reasoning or judgment," and (3) "[t]he provocation would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than judgment." The court also instructed on cooling off, among other things. It stated: "If enough time passed between the provocation and the killing for a person of average disposition to 'cool off' and regain his or her clear reasoning and judgment, then the killing is not reduced to voluntary manslaughter on this basis."

In this case, the evidence arguably supported two potential theories for the heat-of-passion instruction. Under one theory, Cody acted in a heat of passion based on Fortuin's earlier assault of the brothers. Recall, again, that a little over a month before the killing, Fortuin hit both brothers in the arm with a pipe, and at the time of the killing, Cody said he "want[ed] to get back at [Fortuin] for what he did to him the month prior." That evidence could support a finding that Fortuin's prior assault raised Cody's passions and that those passions remain raised at the time of the killing. Under another theory, Cody acted in a heat of passion based on a series of events, including Fortuin's prior assault of the brothers and his sudden appearance the day of the killing. A cooling-off instruction would doubtless be fitting under the first theory. Less so under the second theory.

Both Cody and the People focus exclusively on the second of these theories. Both presume that to the extent Cody was provoked, he was provoked because of a series of acts culminating in Fortuin's sudden appearance on the day the brothers stabbed him. Both then agree that the cooling-off period must have occurred, if at all, after Fortuin's appearance on that day. But they dispute whether he could have cooled off in that time frame. The People argue he could have. They note that the brothers attacked Fortuin in two areas on that day: first in the street near the red-tagged house and then about 100

20

yards away, after Fortuin managed to flee this short distance before the brothers resumed their attack. The People argue that Cody had time to cool off before chasing Fortuin over this distance, reasoning that once Fortuin started fleeing, any potential threat that he may have posed had dissipated. Cody disagrees, asserting that the brief encounter included no time to cool off.

For purposes here, we will assume that the cooling-off period must have occurred, if at all, after Fortuin's appearance on the day of the killing. We will assume too that based on the evidence, the jury could not find that Cody cooled off after Fortuin's appearance that day. But even with those assumptions, Cody has at most shown that the trial court gave a correct but inapplicable jury instruction—which is typically not a ground for reversal. Evaluating these types of errors, our Supreme Court has applied the standard set forth in *People v. Watson* (1956) 46 Cal.2d 818, which requires reversal when it is reasonably probable that the jury would have reached a more favorable decision to the defendant in the absence of the error. (*People v. Debose* (2014) 59 Cal.4th 177, 205-206.) Our Supreme Court has also explained that "giving an irrelevant or inapplicable instruction is generally ' "only a technical error which does not constitute ground for reversal." ' " (*People v. Cross* (2008) 45 Cal.4th 58, 67.)

Applying these authorities here, we conclude that the trial court's instructing on a cooling-off period, even in error, was a harmless technical error. In assuming this instruction lacked evidentiary support, we are assuming that based on the evidence, no reasonable juror could find that enough time passed between the provocation and the killing for a person of average disposition to cool off. (See *People v. Leon* (2020) 8 Cal.5th 831, 848 [" 'A trial court must give a requested instruction only if it is supported by substantial evidence' "]; *People v. Barnwell* (2007) 41 Cal.4th 1038, 1052 ["A substantial evidence inquiry examines the record in the light most favorable to the judgment and upholds it if the record contains reasonable, credible evidence of solid value upon which a reasonable trier of fact *could* have relied in reaching the conclusion

21

in question"].)  But if no reasonable juror could reach this finding based on the evidence, then it is not reasonably probable that the jury here reached this finding.  We presume, after all, "that the jury has acted reasonably, unless the record indicates otherwise." (*People v. Guiton* (1993) 4 Cal.4th 1116, 1127.)

Cody has given us no reason to conclude otherwise.  He argues that apart from the jury improperly receiving a cooling-off instruction, the prosecution also relied on this instruction in closing.  As he notes, the prosecution stated that the brothers first stabbed Fortuin in the street and then stabbed him again after Fortuin moved a short distance away.  It then argued:  "There was no provocation and there was certainly a cooling off period by the time they reached the victim in the street and certainly when the mortal wounds were inflicted. . . ."  But we are not even sure that the prosecution argued, as Cody believes, that Cody had time to cool off after seeing Fortuin the day of the stabbing. The prosecution argued that the brothers had time to cool off before they initiated the attack.  But time to cool off from when?  Time to cool off from the prior assault five weeks earlier—which would be a fair point?  Or time to cool off from Fortuin's appearance that day?  It is not clear.  In any event, even assuming the latter, we are not persuaded that this limited (and vague) argument demonstrates that the cooling-off instruction was prejudicial.

VI

*Witness Misconduct*

Finally, Cody contends the trial court wrongly excluded evidence about Roesner's past misconduct—namely, her prior arrests for identity theft.  We reject his argument.

"[A] witness may be impeached with any prior conduct involving moral turpitude," including a prior theft.  (*People v. Parker* (2022) 13 Cal.5th 1, 55; *In re Honoroff* (1975) 15 Cal.3d 755, 758.)  But that does not mean that a party can always question a witness about prior conduct involving moral turpitude.  Under Evidence Code section 352, "trial courts possess broad latitude to exclude examination concerning a

witness's prior [conduct] if it finds the prejudicial impact substantially outweighs its probative value." (*Parker*, at p. 55.) "When determining whether to admit a prior conviction for impeachment purposes, the court should consider, among other factors, whether it reflects on the witness's honesty or veracity[] [and] whether it is near or remote in time . . . ." (*People v. Clark* (2011) 52 Cal.4th 856, 931.) "Additional considerations apply when the proffered impeachment evidence is misconduct other than a prior conviction. This is because such misconduct generally is less probative of immoral character or dishonesty and may involve problems involving proof, unfair surprise, and the evaluation of moral turpitude." (*Id.* at pp. 931-932.)

In this case, the trial court allowed Cody to impeach Roesner with a 2017 arrest for first degree burglary, a 2021 arrest for possessing narcotics while armed with a firearm, and a 2021 arrest for bringing narcotics into jail. It also allowed Cody to impeach her with a 2018 conviction for unlawfully taking or driving a car and also an arrest later that year for unlawfully taking or driving a car. But the court added that before the arrest could be used for impeachment, the parties would need to verify that the arrest and the conviction involved separate conduct. Finally, the court allowed Cody to impeach Roesner with a 2012 misdemeanor conviction for identity theft under Penal Code section 530.5. But the court ruled that Cody could not impeach Roesner with her arrests in 2011 and 2012 for identity theft. It reasoned that these arrests related to the same conduct that resulted in the 2012 conviction and so were less compelling, were too prejudicial, and would unduly consume time if allowed in.

On the limited record before us, we cannot say that the trial court abused its discretion in excluding these arrests for identity theft. (See *People v. Parker, supra*, 13 Cal.5th at p. 55 [noting trial court's "broad latitude" to prevent examination on a witness's prior conduct].) Cody argues otherwise. But he never acknowledges the trial court's finding that both arrests related to the same conduct that resulted in her 2012 conviction for identity theft—which the court allowed in. And while he claims that these

two arrests showed that Roesner committed two distinct acts of identity theft, he cites nothing to show that to be true. Having no reason to question the trial court's finding that these two arrests concerned only one act of identity theft—the same one act of identity theft covered in the 2012 conviction—we cannot say that the trial court erred in allowing Cody to question Roesner only about her conviction.

DISPOSITION

The judgment is affirmed.

/s/
BOULWARE EURIE, J.

We concur:


/s/
EARL, P. J.


/s/
WISEMAN, J.*

---

\* Retired Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

24